COURT OF APPEALS
DECISION
DATED AND FILED

August 26, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP649**

STATE OF WISCONSIN

Cir. Ct. No. 2022CV194

IN COURT OF APPEALS
DISTRICT III

---

BOYD A. FRITZINGER AND FRITZ CONTRACTING, INC.,

PLAINTIFFS-APPELLANTS,

V.

AMERICAN FAMILY MUTUAL INSURANCE COMPANY, S.I. AND CRAIG J. STOKES,

DEFENDANTS-RESPONDENTS.

---

APPEAL from an order of the circuit court for Polk County: JEFFERY L. ANDERSON, Judge. *Affirmed*.

Before Stark, P.J., Hruz, and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1      PER CURIAM. Boyd Fritzinger and Fritz Contracting, Inc. (collectively, Fritzinger) appeal from an order granting Craig Stokes and American Family Mutual Insurance Company, S.I. (collectively, Stokes) summary judgment dismissing Fritzinger's bailment action.  Fritzinger filed the bailment action following the destruction of Fritzinger's vehicle in a July 2021 fire that occurred in Stokes' pole barn.

¶2      The circuit court concluded that the facts in the record established that Fritzinger and Stokes engaged in, at most, a gratuitous bailment.  The court further determined that the inference of negligence provided in WIS JI—CIVIL 1026 (2005) did not apply to gratuitous bailment actions.  Moreover, the court concluded that Fritzinger had failed to make a prima facie showing as to the cause of the fire.

¶3      We assume without deciding that the evidence in the record establishes that Stokes was a mutual bailee and owed an ordinary duty of care to Fritzinger.  However, the inference in WIS JI—CIVIL 1026—essentially applying the doctrine of res ipsa loquitur—does not apply to Fritzinger's bailment action under the facts of this case because, consistent with binding case law, the fire at issue was not the kind that does not ordinarily occur in the absence of negligence. *See **Arledge v. Scherer Freight Lines, Inc.***, 269 Wis. 142, 148-51, 68 N.W.2d 821 (1955).  Because Fritzinger failed to put forth sufficient evidence demonstrating that Stokes' negligence caused the pole barn fire, there were no material questions of fact and the circuit court properly granted Stokes' summary judgment motion. We therefore affirm.

**BACKGROUND**

¶4      Fritzinger and Stokes were friends.  For approximately 15 years, Stokes operated a vehicle parts and repair business called "Stoker Service." Generally, Stokes would work out of his truck and drive to his customers. Beginning in 2007, Stokes provided, through Stoker Service, parts, repair, and Department of Transportation ("DOT") inspections for Fritzinger, who owns Fritz Contracting.  Fritzinger testified that "sometimes [Stokes] would give me a bill and sometimes he wouldn't.  If he needed work that I needed to do for him, then we would just trade off."

¶5      It is undisputed that prior to the fire, Stokes stopped charging Fritzinger for labor related to repair work on Fritzinger's vehicles.  Stokes did, however, consistently charge Fritzinger for the cost of vehicle parts and DOT inspections using invoices under the name Stoker Service.  Fritzinger assumed that Stokes marked up the cost of the parts, but he was "not sure."

¶6      In 2020, Stokes completed construction of a steel pole barn that he intended to use as his "toy shop for … retirement."[1]  Fritzinger completed the excavation for the pole barn's "building pad," and, in return, Stokes paid him $5,000, and "the rest of it was basically bartered" through vehicle parts.  Stokes performed all of the electrical work for the pole barn, although he was not formally trained as an electrician, and he insulated the barn himself with "refrigeration panels."  The pole barn did not have smoke detectors or a fire suppression system, but it did have a fire extinguisher.

---

[1] The pole barn was constructed by a third party.

¶7    According to Stokes, he did not use the barn for Stoker Service, and he considered Stoker Service "completely separate from [the] pole barn." Stokes did move his vehicle service equipment—including torches, air tools, cordless tools, and work benches—into the barn over a year prior to the fire. Fritzinger, on the other hand, stated that Stokes used the pole barn for Stoker Service, and Fritzinger recalled "one instance of [Fritzinger] using Stoker Service" after construction of the barn but before the fire. Specifically, in April 2020, Stokes "provided parts for a brake job on [a] truck and trailer." An invoice provided to Fritzinger for that job listed the pole barn as the address for Stoker Service.

¶8    Stokes "retired" around December 2020 after being diagnosed with cancer. As part of his retirement, Stokes stopped repairing vehicles for profit, but he continued to purchase parts at wholesale value and attempted to sell those parts at retail value for profit "up until the time of the fire." The parts process involved a customer calling Stokes about a needed part, Stokes obtaining "the information of the year of the vehicle or the part number," phoning his "distributor," and Stokes having the part delivered either to his personal residence or to his customer's address. Shortly after being diagnosed with cancer, Stokes had surgery and was not "doing too much" work.

¶9    In July 2021, Fritzinger experienced mechanical issues with his Mack truck, including issues with the alternator and an oil leak. On July 21 or 22, 2021, Fritzinger took his truck to Stokes, who diagnosed the problems and suggested repairs. Stokes agreed to order the necessary parts. Fritzinger testified that Stokes' diagnosis of the truck "saved [him] a lot of money." Fritzinger then left the truck parked outside of the pole barn and told Stokes that "if he needed assistance to call" Fritzinger. Later, Stokes parked the truck in the pole barn.

¶10     Stokes testified that he agreed to work on the truck at the pole barn because Fritzinger's "shop was full of materials" due to a recent storm. While the parties did not discuss the cost, if any, that Stokes would charge Fritzinger for repairing the truck, Stokes testified that he was planning on charging Fritzinger what he "paid for the part[s]. No markup." Fritzinger testified that he was "not so sure that" Stokes would charge him for labor to fix the truck but confirmed that he had "no reason to believe that" Stokes "was intending to derive any profit from the work."

¶11     Stokes eventually ordered and received the parts for Fritzinger's truck using his Stoker Service account at River States Truck & Trailer. According to Stokes, at least one day prior to the fire, Fritzinger called Stokes to inform him that Fritzinger could not assist with repairing the truck because Fritzinger's "wife's car broke down up north." Fritzinger had no recollection of making that call. Stokes testified that after he received the call from Fritzinger, he removed the alternator from the truck by himself because he "wanted to get the truck out of the" pole barn.

¶12     On July 23, 2021, the day of the fire, Stokes intended to install the new alternator. He arrived at the pole barn, "sat there, decided what [he] was going to do," "[m]oved some tools around," and left the barn to use the restroom in his nearby camper. Stokes left some electrical tools charging in the pole barn while he was in the camper.

¶13     Stokes was away from the pole barn for approximately 20 to 30 minutes when a fire consumed the barn and destroyed Fritzinger's truck. Evidence presented demonstrated that the fire started on the wall with the charging equipment. The local fire department concluded that the cause of the fire was

"undetermined," but one of the first responders informed Stokes that "chances are" the electrical tools left charging started the fire. Fritzinger testified that Stokes told him that the fire was caused by a "battery charger." American Family determined that the cause of the fire was "possibly electrical," and it compensated Stokes for his loss pursuant to his policy.

¶14 Fritzinger testified that prior to the fire, he had concerns about leaving his property at the pole barn because of the "foam insulation sheets" installed by Stokes and the electrical wiring Stokes performed on his own. Fritzinger conceded, however, that Stokes did not violate any local or state law "that was a cause of the subject fire."

¶15 Thereafter, Fritzinger commenced this bailment action against Stokes. Fritzinger alleged that the temporary transfer of his truck to Stokes' "possession for the purpose of providing repairs to the vehicle" constituted a bailment. Fritzinger further alleged that Stokes was negligent "by failing to adequately secure" Fritzinger's truck and that because Stokes was a bailee, a "presumption of negligence" applied.

¶16 Stokes moved for summary judgment, arguing that he was, at most, a gratuitous bailee and that Fritzinger had failed to present sufficient evidence by which a factfinder could conclude that Stokes was negligent.[2] Stokes contended that Fritzinger failed to provide any evidence that "Stokes would derive any benefit by agreeing to work on [the] truck," and he cited Fritzinger's deposition

---

[2] Stokes further argued that he was entitled to summary judgment because Fritzinger's negligence claim was barred by public policy. The circuit court did not reach this issue, and neither party addresses it on appeal.

testimony that Stokes had stopped billing Fritzinger for labor years earlier. Stokes further argued that Fritzinger could not rely on his own speculation that Stokes marked up pricing for the repair parts. Stokes asserted that expert testimony was required to prove that "any act or omission by Stokes unreasonably caused [Fritzinger's] damages."

¶17    In response, Fritzinger argued that the evidence demonstrated that Stokes was a mutual bailee or, at the very least, that there was a genuine issue of material fact as to the nature of the bailment. Fritzinger argued that the evidence demonstrated that Stokes was a mutual bailee because Fritzinger "expect[ed] to pay for the repair" to his truck after Stokes "ordered the parts and indicated he would perform the repair" and Stokes had previously provided Fritzinger invoices for vehicle repairs using the name Stoker Service. Further, Fritzinger contended, "[w]hile Stokes claimed after the [fire] that he had not intended to be compensated for his work, that was not stated at the time, nor was it consistent with their past dealings." According to Fritzinger, Stokes could not escape liability for bailment by stating after the fire that he would not bill Fritzinger.

¶18    Regardless of whether he had established a gratuitous or mutual bailment, Fritzinger argued that Stokes' negligence could be "inferred." Fritzinger asserted that, under WIS JI—CIVIL 1026, he needed to prove that "damage to the property would not ordinarily occur without someone's negligence." At oral argument, Fritzinger's counsel stated that the inference is

> not the classic res ipsa but it's kind of some res ipsa principles adapted into bailment law and it says we don't have to show that Craig Stokes was negligent. We don't have to prove that…. What we need to show is that this damage would not ordinarily have occurred in the absence of negligence ….

¶19 Fritzinger cited several facts in evidence that he argued supported the inference that his truck would not have been destroyed without Stokes' negligence. For example, Stokes did not have any formal training or license to complete the electrical work in the pole barn; Stokes left the pole barn after placing Fritzinger's vehicle in the barn; during this time Stokes left "tools charging for 20-30 minutes while he went to another building"; the pole barn did not have smoke detectors, and the only fire suppression device in the barn was a fire extinguisher; the fire department told Stokes that the "most likely" cause of the fire was that he left tools plugged in; and American Family concluded that the cause of the fire was "possibly electrical." Moreover, Fritzinger cited "government statistics" detailing "the cause of non-residential building fires."

¶20 The circuit court granted Stokes' motion for summary judgment. The court determined that Stokes was, at most, a gratuitous bailee under the facts presented. The court found that it was undisputed that Fritzinger brought his truck to Stokes because Stokes was "intelligent about finding problems." Stokes determined the issues with the truck and agreed to purchase the necessary parts. Stokes further agreed to let Fritzinger use the pole barn to repair the truck because Fritzinger's shop could not be used at that time. The court determined that both parties agreed to work on the truck together, however, Fritzinger could not help on the day in question. "[I]n other words, there'd be no payment for" repairing the truck as it "was effectively a friend helping a friend with a shop that was open because the other friend's shop was full at the time."

¶21 The circuit court further determined that the inference of negligence outlined in WIS JI—CIVIL 1026 applies to mutual bailments but not to gratuitous bailments. Because the facts presented demonstrated a gratuitous bailment between Stokes and Fritzinger, the court stated that the inference in WIS JI—CIVIL

1026 would not apply. Without the inference, the court stated that the issue was whether Fritzinger made a prima facie showing as to the cause of the fire. The court noted that the only evidence as to the cause of the fire was a "hypothesis" that the electrical work was done incorrectly but that the record was otherwise devoid of "anybody specifically stating that it … was an electrical" issue. Accordingly, the court dismissed Fritzinger's claims with prejudice.

¶22    Fritzinger now appeals.

## DISCUSSION

¶23    On appeal, Fritzinger asserts that the evidence in the record demonstrates that Stokes was a mutual bailee or, at the very least, that there is a genuine issue of material fact as to the nature of the bailment. Regardless, Fritzinger argues that the particular nature of the bailment at issue is not determinative because under either a gratuitous or mutual bailment, Fritzinger "is entitled to an inference of negligence once he establishes" the necessary facts outlined in WIS JI—CIVIL 1026. He contends the circuit court therefore erred by finding that he failed to make a prima facie case concerning Stokes' negligence as a cause of the pole barn fire, and by granting Stokes' summary judgment motion.

¶24    We review a grant of summary judgment de novo, using the same methodology as the circuit court. *Yahnke v. Carson*, 2000 WI 74, ¶10, 236 Wis. 2d 257, 613 N.W.2d 102. Summary judgment shall be awarded if "there is no genuine issue as to any material fact and … the moving party is entitled to a judgment as a matter of law." WIS. STAT. § 802.08(2) (2023-24).[3]

---

[3] All references to the Wisconsin Statutes are to the 2023-24 version.

¶25    "A bailment is created by the delivery of personal property from one person to another to be held temporarily for the benefit of the bailee, the bailor, or both."[4] *Yao v. Chapman*, 2005 WI App 200, ¶19, 287 Wis. 2d 445, 705 N.W.2d 272. "Unlike a sale or gift of personal property, a bailment involves a change in possession but not in title." *Bailment*, BLACK'S LAW DICTIONARY (12th ed. 2024). "It is the element of lawful possession, however created, and duty to account for the thing as the property of another, that creates the bailment, regardless of whether such possession is based on contract in the ordinary sense or not." *Yao*, 287 Wis. 2d 445, ¶19 (citation omitted). Moreover, "[t]o be a bailee of property, a person must have such full and complete possession of it as to exclude, for the time of the bailment, the possession of the owner, and the person must have assumed the charge and control of the property as the sole custodian." WIS JI— CIVIL 1025.5; *Fletcher v. Ingram*, 46 Wis. 191, 202, 50 N.W. 424 (1879).

¶26    "[O]nce a bailment contract is created between a bailor and bailee, either expressly or by implication, the bailee is charged with a duty of care to protect the bailed property from damage or loss."[5] 46 AM. JUR. 3d *Proof of Facts* § 361 (2025) (footnote omitted).

---

[4] A bailor is one who temporarily transfers his or her personal property to another. WIS JI—CIVIL 1025.5 (2009). The person who takes possession of the property is known as a bailee. *Id.*

[5] A bailee is not an insurer of bailed property, and a "bailee normally is liable in tort only for the consequences of the bailee's own negligence, a breach of the bailee's duty to exercise reasonable care to prevent damage to or loss of the bailed goods, or other wrongful acts such as conversion." 8A AM. JUR. 2D *Bailments* § 78 (2025) (footnote omitted).

(continued)

> Although the precise level of care required of the bailee can vary with the circumstances and nature of the bailment, when damage, loss or theft of the bailed property results from the bailee's failure to exercise due care, the bailee may be held liable to the bailor for damages in an action for breach of bailment contract and/or negligence.

*Id.* (footnote omitted).

¶27 "Though all bailees are required to exercise care and diligence in protecting the bailed property, the standard of care that exists in a bailment relationship depends upon the nature of the bailment or the type of bailment involved." 8A AM. JUR. 2D *Bailments* § 109 (2025). "It is a cardinal principle that the amount of diligence required of a bailee hinges on the question of compensation, if any, paid to him [or her]." *Bushweiler v. Polk Cnty. Bank*, 129 Wis. 2d 357, 359, 384 N.W.2d 717 (Ct. App. 1986).

¶28 "Accordingly, three different standards of care arise: slight, where the bailment is for the sole benefit of the bailor; ordinary, where it is for the mutual benefit of bailor and bailee; and great, where it is for the sole benefit of the bailee."[6] *Id.*; *see also* ***Yao***, 287 Wis. 2d 445, ¶21 & n.3; 8A AM. JUR. 2D *Bailments* §§ 1, 106. "Whatever the duty of care, [a] bailment creates a duty to account for the loss of, or damage to, the property." 8A AM. JUR. 2D *Bailments* § 109.

---

Here, Fritzinger's bailment claim against Stokes centered on negligence. A plaintiff must prove four elements to establish negligence: (1) a duty of due care on the part of the defendant; (2) a breach of that duty; (3) a causal connection between the defendant's conduct and the plaintiff's injury; and (4) an actual loss or damage as a result of injury. *Skindzelewski v. Smith*, 2020 WI 57, ¶8, 392 Wis. 2d 117, 944 N.W.2d 575; *Lambrecht v. Estate of Kaczmarczyk*, 2001 WI 25, ¶28, 241 Wis. 2d 804, 623 N.W.2d 751.

[6] The parties agree that the bailment at issue was not for the sole benefit of Stokes, the bailee.

11

¶29 "A gratuitous bailment is one for which the bailee receives no compensation." *Yao*, 287 Wis. 2d 445, ¶19. A gratuitous bailment does not require a contract or an actual meeting of the minds. *Id.* Conversely, a mutual bailment is one in which "an individual takes the personal property of another into the individual's care or custody in exchange for some monetary payment or other benefit." 8A AM. JUR. 2D *Bailments* § 9. In a mutual bailment, the bailee owes a duty to exercise ordinary care with respect to the bailed property. WIS JI—CIVIL 1025.7 (2009); 8A AM. JUR. 2D *Bailments* § 106.

¶30 We assume without deciding that the evidence in the record establishes that Stokes was a mutual bailee and owed an ordinary duty of care.[7] With this assumption in mind, we must now assess whether Fritzinger was entitled to an inference of negligence. As stated above, Fritzinger relies on WIS JI—CIVIL 1026 to argue that an inference of negligence applied to his bailment action against Stokes.

¶31 The inference is described in WIS JI—CIVIL 1026, which is titled "Bailment: Negligence of Bailee may be Inferred," and states:

> [Give first paragraph of WIS JI—CIVIL 1005, Negligence: Defined.]
>
> It is the duty of a person having the possession of the property of another to exercise ordinary care to protect the property from damage.

---

[7] We make this assumption because, in evaluating the evidence on summary judgment, "we draw all reasonable inferences from the evidence in the light most favorable to the non-moving party." *Burbank Grease Servs., LLC v. Sokolowski*, 2006 WI 103, ¶40, 294 Wis. 2d 274, 717 N.W.2d 781. Fritzinger is the non-moving party, and he contends that Stokes was a mutual bailee and owed him an ordinary duty of care for his truck. The evidence reasonably supports these conclusions.

The burden of proof is upon the owner of the property, in this case (plaintiff), to show that the property of (plaintiff) which (defendant) had in (his) (her) possession was damaged as a result of the negligence of (defendant). This means that (plaintiff) must prove that (plaintiff)'s property was received by (defendant) in an undamaged condition and that, during the period of time that (defendant) had the property in (his) (her) care, (defendant) had exclusive possession of the property, and also that the damage to the property would not ordinarily occur without someone's negligence. Proof of these facts is sufficient for you to infer that (defendant) was negligent as to the care of (plaintiff)'s property. In other words, when such a showing is made, the law permits, but does not require, you to infer that (defendant)'s negligence was a cause of plaintiff's damage. You will not make this inference, of course, if (defendant) has offered an explanation, satisfactory to you, of how the damage occurred without (his) (her) fault.

WIS JI—CIVIL 1026. In turn, the first paragraph in WIS JI—CIVIL 1005 (2016) states,

A person is negligent when (he) (she) fails to exercise ordinary care. Ordinary care is the care which a reasonable person would use in similar circumstances. A person is not using ordinary care and is negligent, if the person, without intending to do harm, does something (or fails to do something) that a reasonable person would recognize as creating an unreasonable risk of injury or damage to a person or property.

A Wisconsin Jury Instruction Committee comment to WIS JI—CIVIL 1026 provides that the instruction "proceeds on the theory that the elements indicated create a res ipsa case, rather than raise a presumption of defendant's negligence."[8]

¶32 Even if the inference in WIS JI—CIVIL 1026 could generally apply to a mutual bailment, the inference does not apply under the facts presented here.

---

[8] Because res ipsa concerns an inference of negligence—rather than a presumption of negligence—we use the term "inference" throughout this discussion despite the parties, at times, referring to a "presumption." *See Lambrecht*, 241 Wis. 2d 804, ¶33.

Res ipsa loquitur "describes an inference of negligence" and "is a rule of circumstantial evidence that permits a fact[]finder to infer a defendant's negligence from the mere occurrence of the event." *Lambrecht v. Estate of Kaczmarczyk*, 2001 WI 25, ¶33, 241 Wis. 2d 804, 623 N.W.2d 751. Res ipsa is applicable if: (1) the event in question is of a kind that does not ordinarily occur in the absence of negligence; and (2) the agency of instrumentality causing the harm was within exclusive control of the defendant. *Id.*, ¶34. "When these two conditions are present, they give rise to a permissible inference of negligence, which the jury is free to accept or reject." *Id.*

¶33 In *Arledge*, Arledge claimed that Scherer Freight Lines negligently caused a fire damaging Arledge's property. *Arledge*, 269 Wis. at 144. In particular, Arledge alleged that the fire was caused by a stove in Scherer Freight's possession; the stove was in defective condition; the stove was defectively installed; the stove was not properly inspected and maintained; and the fire was permitted to spread through fault of Scherer Freight's employees. *Id.* at 149. The fire department determined that the cause of the fire was a "[d]efective oil stove." *Id.* at 147.

¶34 On appeal before our supreme court, Arledge argued that res ipsa should have been applied at trial. *Id.* at 149. The court noted that, generally, "the mere occurrence of a fire with resultant injuries does not permit a presumption or inference of negligence," and it concluded that Arledge failed to demonstrate "that the fire in question was of a kind which ordinarily would not or could not have occurred in the absence of negligence." *Id.* at 148-51. The court stated that "[f]ires frequently occur without negligence," and there was no evidence to determine "with any degree of certainty the origin of the fire. It may have started in, upon, under or near the stove with or without negligence on the part of any

one." ***Id.*** at 150. The court stated, "True, in the present situation the room where the fire started, and the stove under or upon which the fire was first observed, were managed by the defendant or its servants." ***Id.*** "However, mere control over the premises and the stove, standing alone, are not sufficient bases for the application of the *res ipsa loquitur* rule." ***Id.***

¶35 The holding in ***Arledge*** fits squarely with the facts of this case and prevents the application of res ipsa through WIS JI—CIVIL 1026. It is true that Stokes had exclusive possession of the pole barn and that the fire likely began somewhere near or on the charging equipment. It is also true that the pole barn was completed less than two years prior to the fire and that Stokes completed the electrical work without any formal training. However, these facts do not demonstrate that the fire at the pole barn is the kind that does not ordinarily occur in the absence of negligence.

¶36 Like the fire in ***Arledge***, there could have been many reasons for the cause of the fire at the pole barn, even if it began with the electrical equipment. For example, were there defects in the charging equipment or electrical wiring? If so, were they known, or could or should they have been discovered by Stokes? Or was the electrical system defectively installed? *See **Arledge***, 269 Wis. at 151 ("If the fire originated from a defect in the structure of the stove, the inquiry is: Was it a patent or a latent defect? Was it known, or in the exercise of ordinary care could or should it have been discovered by the defendant?"). As in ***Arledge***, "[t]he

evidence throws no light upon these questions. Any answers thereto would clearly be predicated upon speculation and conjecture alone."[9] *See* *id.*

¶37 Despite the holding in *Arledge*, Fritzinger asserts that he is entitled to the inference of negligence based upon our supreme court's holding in *Afflerbaugh v. Geo. Grede & Bro.*, 182 Wis. 217, 196 N.W. 224 (1923). In *Afflerbaugh*, our supreme court held that a plaintiff had established a prima facie case by showing "that an unexplained fire occurred in [a] garage where his car was left for repairs, and the car was damaged thereby." *Id.* at 219. The court explained that this rule

> amounts to no more than the requirement that the bailee for hire shall affirmatively overcome the presumption of negligence in the care of the property. This presumption is founded in the fact that the evidence is generally in the possession of the bailee and he should be required to produce it. When such evidence is produced and no negligence is shown, the presumption is overcome.

*Id.* (citing *Milwaukee Mirror & Art Glass Works v. Chicago, Milwaukee & St. Paul Ry. Co.*, 148 Wis. 173, 134 N.W. 379 (1912); *Hildebrand v. Carroll*, 106 Wis. 324, 82 N.W. 145 (1900)). The *Afflerbaugh* court relied upon *Hildebrand*, where the court stated:

> [W]hen the bailment is such that the property is in the exclusive possession of the bailee, away from the bailor, and the property is returned in a damaged condition, and it is shown that the injury is such as does not ordinarily occur without negligence, proof of these facts establishes a *prima facie* case against the bailee to put him [or her] on his [or her] defense. In other words, when such a showing is

---

[9] For reasons explained in this discussion, *Arledge v. Scherer Freight Lines, Inc.*, 269 Wis. 142, 144, 68 N.W.2d 821 (1955), likewise leads us to be unpersuaded by Fritzinger's reliance on "government statistics as to the cause of non-residential building fires" for the proposition that "fires generally don't start and spread in the absence of negligence."

> made, the plaintiff has made a *prima facie* case under the rule that the burden is on the party asserting negligence; and the law will then presume negligence to have been the cause, and casts upon the defendant the burden of showing the loss did not occur through his [or her] negligence, or, if he [or she] cannot affirmatively do this, that, at least, he [or she] exercised a degree of care sufficient to rebut the presumption of it. Thus it will be seen that, upon proof of the facts mentioned, a *prima facie* case is made, and the law then shifts the burden to the defendant to rebut it.

*Hildebrand*, 106 Wis. at 328.

¶38 We view ***Afflerbaugh*** as applying the holding in ***Hildebrand***. As that holding applies to this case, Fritzinger would need to make a prima facie case for the inference of negligence to apply. Merely stating that bailed property was damaged, without more specific factual allegations, is insufficient to meet that burden. Because there are no facts demonstrating that the fire at the pole barn was the kind that does not ordinarily occur in the absence of negligence, Fritzinger failed to make a prima facie case for the inference of negligence to apply.

¶39 Fritzinger does not argue that without an inference supporting negligence, he presented any evidence demonstrating with reasonable certainty what caused the fire or that Stokes negligently caused the fire. Given this concession and our conclusion that the inference of negligence does not apply in this case, the circuit court correctly granted Stokes' motion for summary judgment and dismissed Fritzinger's bailment action.

> *By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.